UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FREEDOM FOUNDATION, a Washington
non-profit corporation,

      *Plaintiff,*

  v.

JOEL SACKS, in his official capacity as
Director of Washington State Department
of Labor & Industries; HEATHER
NORMOYLE, in her individual capacity;
and ELIZABETH SMITH, in her
individual capacity,

      *Defendants.*

CASE NO. 3:19-cv-05937-BJR

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND DENYING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Before the Court are the Parties' Cross-Motions for Summary Judgement.  Defs.' Mot. for Summ. J., Dkt. No. 62 ("Defs.' Mot."); Pl.'s Consolidated Resp. to Defs.' Mot. for Summ. J. and Cross-Mot. for Summ. J., Dkt. No. 70 ("Pl.'s Mot.").[1]

---

[1] Both Parties have requested oral argument.  *See* Defs.' Mot. at i; Pl.'s Mot. at 1.  The Court determines that oral argument is unnecessary to resolve the motions and will, therefore, deny the requests.  *See* Local Rules W.D. Wash. LCR 7(b)(4) ("Unless otherwise ordered by the court, all motions will be decided by the court without oral argument.").

1

This matter involves Plaintiff Freedom Foundation's allegation that Defendants, the Washington State Department of Labor & Industry ("L&I") and its officers, violated Freedom Foundation's First Amendment rights when, on June 27, 2019, representatives of Freedom Foundation attempted to canvass inside L&I's headquarters to commemorate the Supreme Court's decision in *Janus v. AFSCME*, 138 S. Ct. 2448 (2018),[2] but were asked to leave.  Freedom Foundation, a Section 501(c)(3) non-profit organization, broadly claims that, *inter alia*, other groups diametrically opposed to their viewpoints are given preferential access to the building, most notably the Washington Federation of State Employees ("WFSE" or "the Union"), which is the public sector union representing many of L&I's employees.

Having reviewed the Motions, the oppositions thereto, the record of the case, and the relevant legal authorities, the Court will grant Defendants' Motion, deny Freedom Foundation's Motion, and dismiss this matter with prejudice.  The reasoning for the Court's decision follows.

## II.     BACKGROUND

### A.  The Washington Department of Labor & Industry and its Headquarters

L&I is the Washington State agency charged with regulating and enforcing the State's labor and employment laws.  Defendant Joel Sacks is L&I's Director, Defendant Elizabeth Smith is Deputy Director, and Defendant Heather Normoyle is Assistant Director of Human Resources.

---

[2] In *Janus*, the Supreme Court held that public sector unions are not entitled to the mandatory deduction of agency fees from non-consenting, non-union members.  138 S. Ct. at 2486; *see also Yates v. Washington Fed'n of State Employees, Am. Fed'n of States, Cty. & Mun. Employees, Council 28 AFL-CIO*, No. 20-cv-05082, 2020 WL 5607631, at *3 (W.D. Wash. Sept. 16, 2020); *Wagner v. Univ. of Washington*, No. 20-cv-00091, 2020 WL 5520947, at *2 (W.D. Wash. Sept. 11, 2020).  *Janus*'s holding is not relevant to resolving the Parties' disputes at hand but promoting *Janus*'s holding among public sector employees is a central tenet of Freedom Foundation's mission.

*See* First Am. Compl., Dkt. No. 16 ¶¶ 8–10 ("FAC"); *see also* Decl. of Heather Normoyle, Dkt. No. 64 ¶ 2 ("Normoyle Decl.").

L&I is headquartered in Tumwater, Washington, just outside Olympia.  Its headquarters is located at 7273 Linderson Way, SW and houses approximately 1,840 L&I employees.  Defs.' Mot. at 3–4.  Only the South Wing, which is located immediately through the building's main entrance, is accessible to the public.  *Id.* at 3; *see also* Decl. of Brendan Selby, Exs. A, C, Dkt. No. 63-1 at 2, 8 (maps of the first and second floor of the South Wing).  Upon entering the first floor, there is a two story Rotunda.  The first floor includes a reception desk off to the right when entering. Continuing on, there is a staircase leading to the second floor of the Rotunda, which includes a terrace overlooking the first floor of the Rotunda.

The Rotunda Terrace on the second floor contains a number of unrestricted areas open to the public including the Human Resources Department and the cafeteria.  If one turns left at the top of the stairs, follows the Rotunda Terrace around until reaching a corridor turning right as the Terrace dead ends, one reaches the "Terrace Corner" and beyond that the cafeteria. The Terrace Corner is the area in which Freedom Foundation's canvassers set up and which, Freedom Foundation claims, other groups have tabled in the past.  *See* Pl.'s Mot. at 2–3.  Between entering the front door and accessing the Terrace Corner, a guest does not need to show an ID badge.  *See* Defs.' Mot. at 3; Pl.'s Mot. at 3–4.

### B. L&I's Policies for Booking Uses or Events

L&I's Policy 5.04 governs access and use of its facilities for holding events.  *See* FAC ¶ 61; Compl., Ex. 1, Dkt. No. 1-1 ("Policy 5.04").  Policy 5.04's purpose is to "define[] the Department of Labor and Industries' guidelines for use of its facilities."  Policy 5.04 at 2.  It

3

generally describes permissible occasions as "uses," "activities," or "events."  *See generally id.*

According to Policy 5.04, use of the South Wing Auditorium and Conference Rooms is limited to government entities and other facilities available for scheduling are limited to an enumerated list which includes the "rotunda."  *Id.* at 2.

The scheduling section states that "[s]cheduling is coordinated with Facilities Services . . . and will be scheduled on a first-come, first serve basis."  *Id.*  The Assistant Director for Administrative Services (or designee)[3] is provided "final authority for approving requests or exceptions" and the following criteria are enumerated (but not limited to):

- rooms are to be used to conduct business related functions of government;
- the activity does not conflict with a previously scheduled activity;
- the activity does not violate any federal, state or local law;
- maintaining an orderly flow of pedestrian and vehicular traffic, not interfering with agency business or blocking access to the building; and
- the activity does not pose unreasonable risk, damage or injury to persons or property, or liability to the state or Department.

*Id.* at 2–3.

Additionally, Policy 5.04 includes a list of prohibited activities, including "political campaigning," "sales and solicitations," and "demonstrations/rallies within the building."  *Id.* at 3–4.

In order to book an event in the building, an applicant must fill out L&I's Facility Use Application.  FAC ¶ 67; Compl., Ex. 2, Dkt. No. 1-2 ("Facility Use Application").  The Facility

---

[3] Currently, Maurice Perigo serves as Assistant Director for Administrative Services, Decl. of Maurice Perigo, Dkt. No. 65 ¶ 2 ("First Perigo Decl."), but, on June 27, 2019, the date of the incident in question, Defendant Normoyle "was the L&I official solely responsible for interpreting and enforcing L&I's Policy 5.04," Normoyle Decl. ¶ 3.

4

Use Application asks for information regarding the contact person for the event, meeting details such as the date, time, and site requested, and type of activity. Facility Use Application at 2. It also includes terms for use of the building including responsibilities and access information. The Facility Use Application states that "[s]cheduling is coordinated with the Facilities Services Program in Administrative Services" and that "[o]utside groups may not reserve facilities more than four (4) weeks in advance unless approved by the Assistant Director for Administrative Services." *Id.* at 3.

Finally, the Facility Use Application includes a list of "public areas," which include the "Rotunda." *Id.* at 4. It also states that "[u]se of the facility is limited to the 1st and 2nd floors of the South Wing." *Id.* at 2.

Defendants report that historically only three types of entities have requested to use the building: internal users, other governmental entities, and WFSE. Defs.' Mot. at 5. In fact, Defendants produced all applications dating back to 2016 and these reflect that no outside non-governmental group such as the Freedom Foundation, other than WFSE, has submitted a request to use the building. *Id.*

In practice, L&I has required only other governmental entities to use the Facility Use Application. This is because L&I does not require the Application for internal uses, or events sponsored by L&I employees, such as holiday events, a Relay for Life cancer fundraiser, an annual Wellness Fair, and events related to the State's annual Combined Fund Drive. *Id.*

Although at times WFSE has submitted a Facility Use Application, L&I predominately permits WFSE to reserve space by directly contacting L&I's Labor Relations Manager, Tracy Wynder, via email. Defs.' Mot. at 5–6; *see also* Decl. of Brendan Selby, Ex. F, Dkt. No. 63-1 at

37–40 (WFSE Facility Use Application dated May 31, 2016). Defendants claim this special procedure is based on efficiency as WFSE's access to the building is also governed by the Collective Bargaining Agreement ("CBA") between the State of Washington and the Union. Defs.' Mot. at 6; Decl. of Brendan Selby, Ex. E, Dkt. No. 63-1 at 13–35 (CBA effective July 1, 2017–June 30, 2019). Specifically, Article 39 of the CBA governs Union Activities, including that WFSE staff representatives may "have access to the Employer's offices or facilities in accordance with agency policy to carry out representational activities." CBA at 39.1(B)(1). In order to access the building, the CBA provides that representatives still must "notify local management prior to their arrival and will not interrupt the normal operations of the agency." *Id.* at 39.1(B)(2). Further, the CBA provides that WFSE may use State meeting spaces and facilities, stating "[t]he Employer's offices and facilities may be used by the Union to hold meetings, subject to the agency's policy, availability of the space and with prior authorization of the Employer." *Id.* at 39.3(A).

Thus, according to Defendants, it is more efficient to route WFSE's access requests through the Labor Relations Manager who is familiar with the Union, the CBA, and past practices. Still, Defendants assert, by the terms of the CBA, WFSE is subject to agency policy, including Policy 5.04, and is not "permitted to hold impromptu events without permission, and it has seen its requests to use the facility denied on numerous occasions when space is not available." Defs.' Mot. at 6; *see also, e.g.*, Decl. of Brendan Selby, Ex. G, Dkt. No. 63-1 at 42–43 (denying request to table in Terrace Corner in May 2019 where space was unavailable).

Overall, Defendants have produced at least 46 Facility Use Applications from 2018 to 2019 completed by various external government agencies, *see* First Perigo Decl. ¶ 8, First Perigo Decl.,

Ex. A, Dkt. Nos. 65-1–65-4, and numerous email requests from internal employees and WFSE, *see* Decl. of Brandan Selby, Exs. F–K, U, Y–AA, Dkt. Nos. 63-1–63-4, seeking to reserve space in the L&I building for events, often including the Terrace Corner.

## C. Freedom Foundation's Canvassing Efforts

On at least two occasions prior to the events of June 27, 2019, Freedom Foundation's employees canvassed around L&I's building. These events took place in the parking lot outside of L&I's building during the 2015 and 2017 holiday seasons. FAC ¶¶ 18, 19; Defs.' Mot. at 6. Neither time were Freedom Foundation's canvassers asked to leave the parking lots.

On June 27, 2019, three Freedom Foundation canvassers entered L&I's headquarters carrying signs referring to *Janus* and pamphlets with information regarding public sector employees' ability to opt out of union membership and dues. FAC ¶¶ 20–22; Defs.' Mot. at 7–9; Pl.'s Mot. at 6–8.[4] All Parties agree that Freedom Foundation did not submit a Facility Use Application beforehand, or otherwise apply for or receive permission to be present in the building on that day. FAC ¶¶ 46–47; Defs.' Mot. at 7.

---

[4] Freedom Foundation has sent canvassers to several Washington State government office buildings, and, in December of 2017, they were turned away from the Washington Department of Ecology's headquarters in Lacey, Washington. See *Freedom Found. v. Wash. Dep't of Ecology*, 426 F. Supp. 3d 793, 795–97 (W.D. Wash. 2019), *aff'd*, No. 20-35007, 2020 WL 7496465 (9th Cir. Dec. 21, 2020). The Department of Ecology requires visitors to sign in upon arrival and obtain a visitor's badge to proceed past the lobby. *Id.* at 796. Ecology, like L&I, also maintains a policy for using its facilities, Administrative Policy 14-10, which states that "[v]isitors also may not use Ecology facilities to promote or solicit for an outside organization or group." *Id.* at 797. Based on both of these policies, the canvassers did not make it past Ecology's front door and Freedom Foundation filed suit. *See Wash. Dep't of Ecology*, 426 F. Supp. 3d 793. The Honorable Judge Leighton, from whom this case was transferred to the undersigned upon his retirement, held that the Department of Ecology's building was not a designated place for public expression and, thus, the Department could restrict Freedom Foundation's employees from entering to canvass. *Id.* at 801–02. The Ninth Circuit affirmed in a memorandum opinion. *Wash. Dep't of Ecology*, 2020 WL 7496465.

The canvassers briefly stopped at the front desk before proceeding to the Terrace Corner where they intended to engage employees as they entered the cafeteria.  FAC ¶¶ 24–27, 32–33.  After a brief amount of time, the canvassers were approached by Defendants Normoyle and Smith accompanied by several officers from the Washington State Patrol ("WSP"), which contracts with L&I to provide security for the building.  FAC ¶ 41–43.  Upon learning that the group had not obtained prior permission to canvass on that day, Defendant Normoyle asked the canvassers to leave.  FAC ¶ 52.  It is uncontested that another event was taking place that day, "Take Our Daughters and Sons to Work Day," which included the children of L&I employees visiting for the day and using the cafeteria for lunch.  Defs.' Mot. at 7.  It is also uncontested that two events that sought prior permission to table that day on the Rotunda Terrace, one by WFSE and one by an internal charity group, were denied permission because of the conflict with the Take Our Daughters and Sons to Work Day.  *Id.* at 8; *see also* Decl. of Brendan, Exs. K, U, Dkt. Nos. 63-2 at 10; 63-3 at 71–72 (email chains showing denial of WFSE request to table and internal request for bake sale fundraiser for Relay for Life on June 27, 2019).

During the conversation in which Defendant Normoyle asked the canvassers to leave, one of Freedom Foundation's canvassers began taking photographs of the confrontation and of the small crowd which had gathered to see what was happening.  FAC ¶ 53; *see also* Decl. of Brandan Selby, Ex. B, D, Dkt. No. 63-1 at 4–6, 10–11 (photographs taken on June 27, 2019, produced by Plaintiff); Second Decl. of Brandan Selby, Ex. CC, Dkt. No. 74-1 (photograph produced by Plaintiff).  One of the WSP Officers accompanying Defendants Normoyle and Smith ordered the canvasser to cease photographing the scene.  FAC ¶¶ 54–58.

After the brief confrontation, the canvassers peacefully left the premises without further

incident.  *See* Decl. of Brandan Selby, Ex. X, Dkt. No. 63-3 at 119:12–120:6 (Dep. of Maxford Nelson, Freedom Foundation canvasser).

**D.  Procedural History**

On October 2, 2019, Freedom Foundation filed suit in this Court and, on December 13, 2019, filed its operative First Amended Complaint.  FAC, Dkt. No. 16.  Specifically, Freedom Foundation brings several causes of action alleging Defendants violated its canvassers' First Amendment and Equal Protection rights by (1) ejecting them from the building based on the content of their speech; (2) failing to treat it and its canvassers like other similarly situated groups, such as the WFSE; and (3) prohibiting them from taking photographs of the WSO Officers' enforcement action.  FAC ¶¶ 75–124.  Based on the foregoing, Freedom Foundation seeks declaratory and injunctive relief.  FAC ¶¶ 125–34.

### III.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56, the Court must dismiss any claim or defense where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is "material" where it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material facts is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  In the present case, the Parties agree on most of the underlying facts, and, as such, the questions presented are largely legal in nature.

On Cross-Motions for Summary Judgment, the normal burden-shifting approach differs slightly as the Court is instructed to "consider the appropriate evidentiary material identified and

submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001); *see also Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015); *Wagner*, 2020 WL 5520947, at *3.

## IV.    DISCUSSION

Freedom Foundation contends that summary judgment in its favor is appropriate arguing that L&I's headquarters should be treated as an open forum for speech and that Policy 5.04 is both unduly restrictive of Freedom Foundation's First Amendment rights and inequitably favors WFSE based on viewpoint.   Defendants, on the other hand, contend that their Motion for Summary Judgment should be granted, arguing that L&I's building is not an open forum for speech, Policy 5.04's restrictions are reasonable, and L&I does not exercise viewpoint favoritism.

### A.  L&I's Building is a Nonpublic Forum

Speech restrictions on government property, such as L&I's headquarters, are evaluated under a unique forum-based analysis.   This approach is founded on the Supreme Court's recognition that "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 799–800 (1985). Thus, it is said that "the government, 'no less than a private owner of property,' retains the 'power to preserve the property under its control for the use to which it is lawfully dedicated.'" *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (quoting *Adderley v. Florida*, 385 U.S. 39, 47 (1966)): *see also Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) ("it

10

is [] well settled that the government need not permit all forms of speech on property that it owns and controls").

The Supreme Court recently reiterated the standards governing the forum-based approach in *Minnesota Voters All. v. Mansky*.  138 S. Ct. at 1885–86; *see also Amalgamated Transit Union Loc. 1015 v. Spokane Transit Auth.*, 929 F.3d 643, 650–51 (9th Cir. 2019); *Wash. Dep't of Ecology*, 426 F. Supp. 3d at 799.  "Generally speaking," as the Court explained, government properties are split into three categories: traditional public forums, designated public forums, and nonpublic forums.  *Mansky*, 138 S. Ct. at 1885.

In traditional public forums, such as "parks, streets, sidewalks, and the like," the government may impose reasonable time, place, manner restrictions, "but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited."  *Id.* at 1885.  This permissive standard of speech is based on the fact that such forums "by long tradition or by government fiat have been devoted to assembly and debate."  *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).  All Parties in this matter agree that L&I's building is not a traditional public forum.

Designated public forums constitute those properties that "have 'not traditionally been regarded as a public forum' but which the government has 'intentionally opened up for that purpose.'"  *Mansky*, 138 S. Ct. at 1885 (quoting *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469–70 (2009)).  The "defining characteristic" of a designated public forum is that it is open to the same "'indiscriminate use'" and "'almost unfettered access'" as a traditional public forum. *Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 496 (9th Cir. 2015) ("SeaMAC") (quoting *Perry*, 460 U.S. at 47 and *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678

11

1    (1998)).  In designated public forums, the same standard for speech restrictions applies as in public

2    forums.  *Mansky*, 138 S. Ct. at 1885.

3         Finally, nonpublic forums are those "space[s] that '[are] not by tradition or designation a

4    forum for public communication.'"  *Id.* (quoting *Perry*, 460 U.S. at 46).  In nonpublic forums, "the

5    government has much more flexibility to craft rules limiting speech" and can "reserve such []

6    forum[s] 'for [their] intended purposes, communicative or otherwise, as long as the regulation on

7    speech is reasonable and not an effort to suppress expression merely because public officials

8    oppose the speaker's view.'"  *Id.* (quoting *Perry*, 460 U.S. at 46).  For example, in *Mansky* the

9    Supreme Court held that Minnesota polling places "at least on Election Day" qualified as

10   nonpublic forums as they are "set aside for the sole purpose of voting."  *Id.* at 1886.[5]

11

12        To ascertain whether a government entity has opened its property as a designated public

13   forum, the Court looks at "the nature of the property[,]" "its compatibility with expressive

14   activity[,]" and "the policy and practice of the government."  *Cornelius*, 473 U.S. at 802; *see also*

15   *SeaMAC*, 781 F.3d at 496 ("To determine whether the government has imbued its property with

16   the essential attributes of a traditional public forum, we focus on the government's intent.").  As

17   Judge Leighton aptly summarized in *Washington Dep't of Ecology*, the "central inquiry" in forum

18   designation is "whether [the] government intended to create a public forum in the first place."  426

19   F. Supp. 3d at 799.  "The government does not create a public forum by inaction or by permitting

20   limited discourse, but only by intentionally opening a nontraditional forum for public discourse."

21

22

23   _____

24

25   [5] In the Ninth Circuit, nonpublic forums are also sometimes referred to as "limited public forums."  *Am. Freedom
     Def. Initiative v. King Cty.*, 796 F.3d 1165, 1169 n.1 (9th Cir. 2015) ("AFDI").

*Cornelius*, 473 U.S. at 802.  Thus, where the government shows an "intent to control and limit" the use of the forum, it is nonpublic.  *Wash. Dep't of Ecology*, 426 F. Supp. 3d at 799.  Further, the nature of the building itself is relevant as "Courts have consistently found public property to be a nonpublic forum where the evidence shows . . . that the property's purpose is to conduct or facilitate government business, and not to provide a forum for public expression."  *Id.* at 801 (listing cases).

The Court concludes that by purpose and demonstrated intent, L&I's building is a nonpublic forum.  First, the nature of the building as an office leads to the conclusion that it is a nonpublic forum.  As the Supreme Court advised in *Cornelius*, "[t]he federal workplace, like any place of employment, exists to accomplish the business of the employer."  473 U.S. at 805.  Thus, just as the building in *Department of Ecology*, the purpose of L&I's headquarters is to serve as a work place for its near 2,000 employees, not a forum of free debate and expressive activity.  *See Wash. Dep't of Ecology*, 426 F. Supp. 3d at 799–802.

Further, the existence of Policy 5.04 and the Facility Use Application demonstrates L&I's intent to limit access.  The Court looks at implementation of a limiting policy to determine a forum's status.  *See SeaMAC*, 781 F.3d at 497.  It is clear from the record that L&I has consistently enforced Policy 5.04, specifically its scheduling coordination and availability requirements, as demonstrated by the fact that at least three use-seekers were turned away from using the Terrace Corner on June 27, 2019 as the area was already in use.

As the Ninth Circuit made clear in *SeaMAC*, "[i]f the government requires speakers seeking access to obtain permission, under pre-established guidelines that impose speaker-based or subject-matter limitations, the government generally intends to create a limited, rather than a

designated, public forum." *Id.*  That is exactly what L&I has done.  In establishing Policy 5.04, L&I has demonstrated that it intended to put constraints on who may access the facility, including a requirement that the space actually be available, and what they may do while using the space, by prohibiting certain activities such as political campaigning, sales and solicitations, and demonstrations/rallies.  Furthermore, L&I has published a publicly-available and historically utilized policy and application with definite terms, including standards, prohibitions, and an application form.  In short, L&I has expressed a clear intent to maintain its facilities as a nonpublic forum.

Freedom Foundation argues that the process by which L&I actually booked events according to Policy 5.04 was so informal that it did not represent a cognizable procedure for maintaining a nonpublic forum.  *See* Pl.'s Mot. at 16–17; *see also* Pl.'s Reply in Support of Cross-Mot. for Summ. J., Dkt. No. 77 at 3–10 ("Pl.'s Reply").  To illustrate this point, Freedom Foundation points to the procedure by which WFSE is allowed to email the Labor Relations Manager, rather than submitting a formal Facility Use Application, as evidence that "the union's use of the second-floor terrace area was essentially 'at large.'"  Pl.'s Mot. at 16.

The record dispels any argument that WFSE had indiscriminate access to L&I's facilities.  The Parties have submitted numerous emails showing WFSE's representative requesting permission to use space at L&I.  Further, there is evidence that the requests have been denied because of conflicts in schedules.  *See, e.g.*, Pl.'s Mot., Ex. 75, Dkt. No. 72-2 at 550–53 ("Pl.'s Ex. 75") (email chain from 2017 in which alternative date for WFSE is necessary due to a conflict in requested date).  Again, in the case before this Court, WFSE was denied permission to table on the same day, in the same place, as Freedom Foundation's canvassers.

14

1

2

**B. Policy 5.04 is Reasonable and Viewpoint Neutral**

The Court having determined that L&I's building is nonpublic forum, Policy 5.04 and its

3

application are sustainable so long as the Policy is reasonable and viewpoint neutral.  *Pleasant*

4

*Grove*, 555 U.S. at 470; *SeaMAC*, 781 F.3d at 496.

5

*1.  Reasonableness*

6

Policy 5.04 is sustainable so long as it is "reasonable in light of the purpose served by the

7

forum."  *Mansky*, 138 S. Ct. at 1886 (quoting *Cornelius*, 473 U.S. at 806).  The Ninth Circuit

8

9

employs a three prong test to determine reasonableness.  *See Amalgamated Transit Union Loc.*

*1015*, 929 F.3d at 653–56; *AFDI*, 796 F.3d at 1170–71; *SeaMAC*, 781 F.3d at 499–501.  First, the

10

Court must determine whether the speech restriction is reasonable in light of the purpose served

11

12

by the forums.  Second, the Court must examine whether the standard is sufficiently definite and

13

objective.  Finally, the Court must conduct an independent review of the Policy's application in

14

the case at hand.  *See SeaMAC*, 781 F.3d at 499–501.

15

*a.  Whether the policy Standard is Reasonable in Light of the Purpose served by the*

16

*Forum*

17

The first requirement "focuses on whether the exclusion is consistent with 'limiting [the]

18

forum to activities compatible with the intended purpose of the property.'"  *SeaMAC*, 781 F.3d at

19

20

499 (quoting *Perry*, 460 U.S. at 49).  Policy 5.04 easily meets this standard and it is not much

21

debated by the Parties.  The forum is an office building housing nearly 2,000 employees devoted

22

to carrying on L&I's governmental duties.  Limiting access and expression is reasonable in light

23

of the purpose of an office space.  *See Wash. Dep't of Ecology*, 426 F. Supp. 3d at 802.

24

25

b.  <u>Whether the Standard is Sufficiently Definite and Objective to Prevent Arbitrary or Discriminatory Enforcement by Government Officials</u>

Policy 5.04 must also be "definite and objective." *SeaMAC*, 781 F.3d at 499 (citing *Hopper v. City of Pasco*, 241 F.3d 1067, 1077 (9th Cir. 2001)).  Review of Policy 5.04's terms is meant to eliminate arbitrary standards as "[a]bsent objective standards, government officials may use their discretion to interpret the policy as a pretext for censorship."  *Hopper*, 241 F.3d at 1077.

Freedom Foundation argues that the terms of Policy 5.04 are insufficiently definite and, therefore, invite arbitrary enforcement.  *See* Pl.'s Mot. at 29.  For example, it claims that the Policy does not sufficiently define "event," "activity," or "use" as a triggering mechanism for an applicant to know whether they must submit a Facility Use Application.  *Id.*; *see also id.* at 11–13. Additionally, Freedom Foundation takes exception with some of the terms within the limitations of use section which prohibit activities like "political campaigning" and "solicitation."  *Id.* at 29.

It is clear upon review of the record that Policy 5.04 is sufficiently definite and objective. The Policy clearly states that scheduling is to be coordinated with L&I and "will be scheduled on a first-come, first-serve basis."  Policy 5.04 at 2.  One of its enumerated criteria is that "the activity does not conflict with a previously scheduled activity."  *Id.*  Finally, the Policy provides a link for the Facility Use Application, which may be used to reserve space in the building.  *Id.* at 4.  Thus, the face of the Policy makes clear that a group seeking to use space within the building must obtain permission from L&I and that one of the criteria used for granting access is availability.  It is evident that numerous groups have understood, and adhered to, this requirement as the record is replete with internal requests, requests from other government agencies, and from WFSE to use the Terrace Corner for various activities.  Further, it is clear that L&I regularly applies availability criterion as, again, on June 27, 2019 two other groups were turned away because of scheduling

16

conflicts.

Further, Freedom Foundation's complaints as to the alleged vagueness of terms such as "political campaigning" or "solicitation" are immaterial here.  It is clear from the record that Freedom Foundation's canvassers were asked to leave because they violated two of the Policy's criteria, having both failed to submit an application to be present and attempting to hold an event that conflicted with a previously scheduled activity.

> c. *Whether an Independent Review of the Record Supports the Government's Conclusion that the Desired Speech Violated the Government Policy*

It is clear to the Court that Freedom Foundation's actions violated Policy 5.04.  The Policy required the canvassers to submit an application; they did not.  The Policy provides that applications will be denied if there is a conflict in schedules; there was a conflict.  The Defendants were justified in requiring Freedom Foundation to leave the premises.

> 2. *Viewpoint Neutrality*

Policy 5.04 is sustainable so long as it, and its application, are viewpoint neutral.  *See SeaMAC*, 781 F.3d at 501–03.

Freedom Foundation argues that L&I's application of Policy 5.04 is not viewpoint neutral as it provides preferential access to WFSE based on its approval of WFSE's viewpoints and disapproval of Freedom Foundation's advocacy positions.  Pl.'s Mot. at 31–35; *see also* Pl.'s Reply at 14–18.  This argument has two prongs, first that WFSE is provided preferential treatment and, second, that L&I has demonstrated animus against Freedom Foundation, which was the true reason its canvassers were asked to leave L&I's building.  Neither prong withstands review of the record.

First, Freedom Foundation claims that WFSE is accorded preferential terms for accessing the building.  For example, Freedom Foundation points to the fact that L&I allows WFSE to email

its requests to the Labor Relations Manager or there have been times WFSE used the space when they did not receive prior permission.  *See* Pl.' Mot. at 31 (citing Pl.'s Mot., Exs. 59, 62, 74, Dkt. No. 72-2 at 503, 509, 550–53).

Freedom Foundation's arguments regarding WFSE conflate differences in treatment between it and the Union with viewpoint discrimination.  In other words, just because WFSE is treated differently, does not demonstrate that such differences are based on viewpoint favoritism by L&I.  As Judge Leighton recognized in *Department of Ecology*, WFSE and Freedom Foundation are not, for all intents and purposes, on equal footing in all regards.  *See Wash. Dep't of Ecology*, 426 F. Supp. 3d 793, 800–01; *see also Wash. Dep't of Ecology*, 2020 WL 7496465, at *2.  The Union is the exclusive bargaining representative of L&I's unionized employees and, in that capacity, has negotiated certain access rights regarding its representational activities in the CBA.  This does not demonstrate a viewpoint discriminatory motive for treating the parties differently.

Similarly, the Ninth Circuit recently held that a Washington statute that granted access to the personal information of in-home care providers to unions, but not the Freedom Foundation, did not engage in viewpoint discrimination.  *See Boardman v. Inslee*, 978 F.3d 1092 (9th Cir. 2020).  Specifically, the Circuit concluded that a government entity "engages in viewpoint discrimination when it 'targets . . . particular views taken by speakers on a subject[,]'" *id.* at 1110 (quoting *Ctr. for Bio-Ethical Reform, Inc. v. City and County of Honolulu*, 455 F.3d 910, 921 (9th Cir. 2006)), but not where a challenged provision or policy fails to "'draw[ ] distinctions based on the message[s]' conveyed by either [Freedom Foundation] or the Unions[,]" *id.* (quoting *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)).  In other words, the statute did not engage in

18

viewpoint discrimination because it gave access to the unions (and not Freedom Foundation) based on their legal statuses, not their viewpoints.  Similarly, there is no viewpoint discrimination here where L&I provides certain access to WFSE based on its status as exclusive bargaining representative, but denies the same access to Freedom Foundation.  Whatever slight preference the WFSE receives over Freedom Foundation, such as being able to email their requests rather than submit an application, is rationally related to the position of the Union as a repeat actor charged with representing L&I's employees.  *See id.* at 1117–1119.[6]

Finally, the Court has reviewed the entire record, and the instances and emails which Freedom Foundation claims demonstrate that L&I maintains an animus against it.  The Court concludes that an alleged missed email[7] or some errant messages from L&I employees not involved in the decision to enforce Policy 5.04 on June 27, 2019 do not demonstrate viewpoint discrimination.

---

[6] To the extent Freedom Foundation advances an Equal Protection claim based on the difference in treatment between WFSE and Freedom Foundation, the conclusion above resolves this claim.  The Equal Protection Clause requires that "no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  Where no protected class is implicated, as here, a distinction between groups "need only rationally further a legitimate state purpose" to be valid under the Equal Protection Clause.  *Boardman*, 978 F.3d at 1118 (quoting *Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 291 (1984)).  Here, the Court finds there to be a rational distinction between WFSE and Freedom Foundation.

[7] Freedom Foundation argues animus is demonstrated, for example, by the fact that several months before June 27, 2019 its Outreach Director, Matthew Hayward, sent an email inquiring about L&I's access and use policies, but never received a response.  *See* Pl.'s Reply at 18–20 (referencing Pl.'s Mot., Ex. 111, Dkt. No. 72-2 at 699).  L&I confesses that the lack of response was an oversight.  *See* Defs.' Opp'n to Pl.'s Cross-Mot. and Reply in Support of Mot. for Summ. J., Dkt. No. 73 at 11–12 ("Defs.' Reply"); Second Decl. of Maurice Perigo, Dkt. No. 75 ¶ 12 ("I and the other facilities staff . . . do not recall seeing an e-mail from Matthew Hayward in February 2019, asking about the Building's reservation policies.  We endeavor to respond to all e-mails and phone calls placed to the Department.  This appears to have been an inadvertent oversight.").  The Court concludes that this oversight does not demonstrate animus.

Based on the foregoing, Freedom Foundation has failed to establish that L&I's application of Policy 5.04 demonstrates viewpoint discrimination.

**C. Photograph Claim**

Freedom Foundation argues it is entitled to summary judgment on its claim that Defendants violated its First Amendment rights when a WSP Officer, serving as building security, asked Freedom Foundation's canvasser to stop taking photographs, as the Officer was acting with Defendants' actual or apparent authority. Pl.'s Mot. at 35, 43–46; Pl.'s Reply at 25–26.

Defendants contend they are entitled to summary judgment on the same claim because neither Defendant Normoyle nor Defendant Smith instructed the Officer to request that the canvassers stop taking photos. Defs.' Mot. at 24–25; Defs.' Reply at 13–14, 30–31. As neither the WSP Officer in question, nor WSP at large, is named as defendant in this case, Defendants argue this cause of action should be dismissed in its entirety.

The Parties do not dispute the relevant law, namely that "[t]he First Amendment protects the right to photograph and record matters of public interest" including "the right to record law enforcement officers engaged in the exercise of their official duties in public places." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018); *see also Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 827 n.4 (9th Cir. 2020) (listing cases). Further, while the Court has already determined L&I's building is a nonpublic forum, and thus L&I could place reasonable, viewpoint-neutral restrictions on photography, L&I maintains no policy or prohibition on taking photographs within its building. *See Askins*, 899 F.3d at 1044 (reciting the familiar forum-based standards).

What the Parties neglect in their arguments over principles of agency, however, is that

20

Freedom Foundation's First Amendment claims are brought pursuant to 42 U.S.C. § 1983. FAC ¶¶ 97–104. Regardless of actual or apparent authority between WSP and L&I, vicarious liability is inapplicable to Section 1983 claims. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (internal citation removed) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Thus, a "supervisory official may be held liable under § 1983 only 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Keates v. Koile*, 883 F.3d 1228, 1242–43 (9th Cir. 2018) (quoting *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011)). Simply put, "Officers may not be held liable merely for being present at the scene of a constitutional violation or for being a member of the same operational unit as a wrongdoer," they must be personally liable in some manner for the constitutional violation. *Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018).

Here, there is no evidence that any of the individual Defendants participated in, or set in motion, the alleged First Amendment violation. Defendant Sacks was not present at the confrontation between Defendants Normoyle and Smith and the Freedom Foundation canvassers. The uncontested facts show that neither Defendant Normoyle nor Defendant Smith ordered the WSP Officer to direct the canvasser to stop photographing. *See* Decl. of Brendan Selby, Ex. R, Dkt. No. 63-3 at 28 (Freedom Foundations' Third Supplemental Responses to Defendants' Requests for Admission to Plaintiff stating that "Plaintiff admits that Defendants Normoyle and Smith did not explicitly mention the taking of photographs by the Foundation's representatives during the incident on June 27, 2019").

The Court, therefore, will grant Defendants' summary judgment motion as to this claim.

## V.    CONCLUSION

Based on the foregoing, the Court determines that (1) L&I's building is a nonpublic forum, (2) L&I's Policy 5.04 is both reasonable and viewpoint neutral, and (3) L&I has not violated Freedom Foundation's First Amendment rights.

Based on these conclusions, it is ORDERED as follows: the Court hereby GRANTS Defendants' Motion to Dismiss, DENIES Freedom Foundation's Motion to Dismiss, and DISMISSES this action with prejudice.

DATED this 5th day of April, 2021.

BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE